**GAUDIYA VAISHNAVA SOCIETY, a California Nonprofit, Religious Corporation, and Cultural Media Services, a California Nonprofit Corporation, dba Eco Watch, Plaintiffs,**

v.

**CITY OF MONTEREY, a California Municipal Corporation, and City of Santa Cruz, a California Municipal Corporation, Defendants.**

No. C97–20583 RMW.

United States District Court,
N.D. California.

July 14, 1998.

Law Offices of David M. Liberman, Los Angeles, CA, for plaintiffs, David M. Liberman, of counsel.

City Attorney for the City of Monterey, Monterey, CA, for defendant City of Monterey, William B. Conners, Mary C. Rice, of counsel.

Atchison & Barisone, Santa Cruz, CA, for defendant City of Santa Cruz, John G. Barisone, of counsel.

## MEMORANDUM–DECISION & ORDER

McCURN, Senior District Judge.*

Plaintiffs Gaudiya Vaishnava Society ("GVS") and Cultural Media Services, doing business as Eco Watch ("Eco Watch"), commenced this action seeking declaratory and injunctive relief prohibiting defendants, the City of Monterey, California ("Monterey") and the City of Santa Cruz, California ("Santa Cruz"), from enforcing their respective ordinances, Monterey City Code section 32–3 (the "Monterey ordinance") and Santa Cruz Municipal Code section 5.43.025 (the "Santa Cruz ordinance"). Plaintiffs contend that the ordinances are unconstitutional on their face and as applied to them because they infringe upon their First Amendment rights by prohibiting the distribution of message-bearing T-shirts in exchange for donations anywhere in Monterey and along the waterfront area in Santa Cruz. Essentially, GVS challenges the Monterey ordinance while Eco Watch challenges the Santa Cruz ordinance.

At the outset, plaintiffs applied for a temporary restraining order and preliminary injunction prohibiting defendants from enforcing their respective ordinances. The court denied the TRO application and directed defendants to show cause why the court should not issue a preliminary injunction prohibiting the enforcement of the ordinances pending a trial on the merits. See Order Denying Application for Temporary Restraining Order and Order to Show Cause, July 7, 1997 (Whyte, J.), Docket Document Number ("Dkt.No.") 12. Thereafter, the court denied plaintiffs' motion for a preliminary injunction on the basis that "plaintiffs have not shown a likelihood of success on the merits" in that the ordinances "appear to be content neutral, narrowly tailored to serve substantial government interests, and leave ample alternative channels of communication." See Order Denying Plaintiffs' Motion for Preliminary Injunction, August 18, 1997 (Whyte, J.), Dkt. No. 32.

The matter was then set down for trial which was held February 23, 1998 through February 26, 1998 in San Jose, California. The parties presented evidence through the testimony of witnesses and the introduction of numerous exhibits. Additionally, on February 27, 1998 the court, along with the parties, visited both Monterey and Santa Cruz to observe firsthand the areas discussed during the trial. At trial, plaintiffs sought a permanent injunction prohibiting the defendants from enforcing their respective ordinances and a declaration from the court that the ordinances each violated the First and Fourteenth Amendments to the United States Constitution and Article I, section 2 of the Liberty of Speech Clause of the California Constitution. At the conclusion of plaintiffs' case, Monterey moved pursuant to Rule 52(c) of the Federal Rules of Civil Procedure for judgment on its behalf on the basis that GVS lacked standing to challenge Monterey's ordinance. The court reserved on Monterey's motion and now finds, as discussed herein, that GVS, as well as Eco Watch, has standing to maintain this action. In accordance with Rule 52(a) of the Federal Rules of Civil Procedure, the following constitutes the

---

* Neal. P. McCurn, Senior United States District Judge for the Northern District of New York, sitting by designation.

court's decision in this matter and comprises the court's findings of fact and conclusions of law. For the reasons that follow, the court denies plaintiffs' demand for declaratory and injunctive relief and dismisses the complaint against both defendants.

## BACKGROUND AND FACTS

GVS, a branch of the Krishna Consciousness religious organization, and Eco Watch, an environmental preservation organization, are non-profit organizations that seek the right to continue their activities of distributing message-bearing T-shirts in exchange for requested donations. Both GVS and Eco Watch display and distribute their T-shirts in order to spread their messages as widely as possible, as well as to raise funds for their causes. Eco Watch concedes that its primary source of funds is the distribution of T-shirts in exchange for donations.

Between February 1995 and September 1996, GVS distributed its message-bearing T-shirts in exchange for donations in Monterey. Specifically, GVS conducted its activities adjacent to the wharf—between the Maritime Museum and Monterey's Recreation Trail—in an area referred to as the "free-speech" area. Between April 1994 and April 1996, Eco Watch distributed its message-bearing T-shirts on public sidewalks and walkways along the waterfront area in Santa Cruz.

Since 1936, Monterey has generally prohibited the use of public property for the private sale of merchandise pursuant to a city ordinance. The current form of the Monterey ordinance, in existence since 1985, provides as follows:

> No person shall use or employ any portion of any public street, lane, alley, park, mall, plaza or any other public property for the conducting or transaction of any private commercial business or activity. This section shall not apply to concessions granted by or to lands leased by the City of Monterey.

See Defendant Monterey's Exhibit ("Monterey Exh.") "5" (Monterey ordinance).

In response to requests from non-profit groups, Monterey set up a free-speech area in March 1995 and permitted non-profit groups to sell or exchange for donations message-bearing T-shirts and to conduct other related First Amendment activities. *E.g.,* Monterey Exh. "6" (city council minutes of March 21, 1995 meeting that created free-speech area); Plaintiffs' Exhibit ("Pl.Exh.") "K" (February 1995 letter from city attorney to plaintiffs' attorney advising that Monterey will allow T-shirt sales in free-speech area). It is clear that Monterey did not embrace the notion of setting u the free-speech area for the sale or exchange of T-shirts, but rather, created it to avoid litigation with groups that wanted to distribute their message-bearing merchandise. *See* Monterey Exh. "6" (city council minutes reciting that the "City Attorney said Federal Court decisions have mandated this action" and it is "not City policy, but a Federal Court Mandate").

Monterey's primary source of income is derived from tourism. As a result, a significant resource of Monterey is its well-known reputation as a premier tourist destination and meeting town. In furtherance of maintaining and enhancing its reputation and protecting its economic viability, Monterey is particularly concerned with its public safety, its aesthetics and historic appeal, and the protection of its local merchant economy.

Regarding public safety, the director of public facilities for Monterey, Carl E. Anderson, testified that sidewalk vending creates a dangerous situation because there is insufficient space in the public areas such as the walkways to accommodate both vendors and pedestrians. This leads to dangerous situations such as the spillover of pedestrian traffic into the roadways. Monterey contends that while this problem is city-wide, it is particularly significant in heavily traveled areas such as the free-speech area, the wharf, downtown, and Cannery, Row.[1] In the free-speech area, congestion is heavy because this is a focal point near the wharf where

---

1. Cannery Row is a former industrial section of Monterey located on the west side of Monterey Bay that has since been converted into a tourist and shopping district. Accordingly, the area has

pre-existing narrow roadways with small sidewalks which are not particularly conducive to heavy pedestrian traffic.

many walkways, including the Recreation Trail, converge, as well as the area where tour buses unload passengers.[2] Similarly, in the downtown section of Monterey, many sidewalks are irregular and vary in width, which likewise contributes to the congestion problems.

Monterey also contends that the cluttered open market appearance created by sidewalk vending detracts from its efforts to maintain its aesthetic appeal. *See, e.g.,* Monterey Exh. "8." (picture depicting non-profit groups distributing T-shirts in free-speech area). Anderson testified that he received numerous complaints about the free-speech area because the T-shirt tables blocked the view of Monterey Bay from inside the Maritime Museum, which is designed with windows that allow those inside to take advantage of an existing scenic easement to view the bay. Anderson also received complaints that sidewalk vending added visual clutter to the area outside the museum.

In addition to the congestion of pedestrian traffic and the obstruction of views, Anderson also relayed that local merchants vigorously complained about the T-shirt sidewalk vendors. The substance of these complaints was that the vendors unfairly competed with merchants because they were not subject to taxes or regulation and therefore could distribute their T-shirts and wares in exchange for significantly less money than local merchants could sell them.

Monterey maintained its free-speech area until August 1996, at which time it rescinded its decision to allow non-profit groups to distribute their T-shirts and other merchandise. *See* Monterey Exh. "7" (city council minutes of August 6, 1996 meeting rescinding free-speech area); Pl.Exh. "N" (August 1996 letter from city attorney to all free-speech area permit holders that the city council "voted to eliminate the 'Free–Speech' sales area."). Monterey rescinded its free-speech area in reliance on the Ninth Circuit's decision in *One World One Family Now v. City and County of Honolulu,* 76 F.3d 1009 (9th

Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 554, 136 L.Ed.2d 403 (1996), which, Monterey contends, paved the way for cities to prohibit sidewalk commerce without violating the First Amendment if the prohibition serves legitimate governmental interests, is content neutral, is narrowly tailored, and leaves open ample alternative channels of communication. Monterey notified the non-profit groups using the free-speech area that they could no longer continue distributing T–Shirts or other merchandise for donations in the free-speech area because the Monterey ordinance prohibited the sale of any merchandise on public property. *See* Pl.Exh. "N."

The Monterey ordinance has not been enforced nor has enforcement been threatened against GVS or any of its members. However, in accordance with Monterey's mandate, GVS, as well as other non-profit groups, has refrained from distributing its T-shirts in the free-speech area or anywhere else in Monterey. Ronald Hebner, a member of GVS and the person designated by GVS to oversee its operations in Monterey, testified that GVS has definitive plans to recommence its activities if the Monterey ordinance is found invalid.

With regard to Santa Cruz, the evidence demonstrated that in early 1980 Santa Cruz began a redevelopment and planning process to capitalize on its reputation as one of the premier family tourist attractions in Northern California. Santa Cruz considers the waterfront area, which includes its beaches, the boardwalk amusement park, and its municipal wharf, critical to its economic stability because it generates revenues from taxes and provides employment for its residents. *See* Santa Cruz Exh. "2" (map delineating waterfront area). Santa Cruz receives millions of tourists a year generating approximately $400 million in revenue from its tourist industry. *See, e.g.,* Santa Cruz Exh. "9" (news accounts of Santa Cruz' tourist industry).

In connection with Santa Cruz' redevelopment process, the city adopted the "Santa Cruz Beach Area Plan," in July 1980. *See*

---

**2.** The free-speech area's location interferes with the Recreation Trail because it prevents users of the Trail—which is designed mainly for recreational exercise—from maintaining a steady pace through the free-speech area without stopping or slowing down in order to avoid colliding with other pedestrians.

Santa Cruz Exh. "3" (resolution adopting Plan) and "4" (excerpts of Plan). The Beach Area Plan stressed the significance of pedestrian traffic flow and maintaining a more aesthetically pleasant waterfront area. *See id.* (Planning Issues at 65; Policy Statements at 67) In 1991, Santa Cruz adopted its "Beach Street Promenade Design Plan" which reiterated the need to improve pedestrian traffic flow and to maintain the aesthetics of the waterfront area. *See* Santa Cruz Exh. "5" (city council resolution adopting Plan and the Beach Street Promenade Design Plan) (the 1980 Beach Area Plan and the 1991 Beach Street Promenade Design Plan are collectively referred to as the "Plans"). The theory behind improving pedestrian traffic flow and the aesthetics of the area was that it would increase tourism and allow the local tourist-based economy to prosper. *See* Santa Cruz Exh. "4" and "5."

According to the Plans and the Redevelopment Manager for Santa Cruz, Joseph Hall, the walkways along the waterfront were designed exclusively for pedestrian use. *See id.* Hall testified that these Plans were developed, in large part, through a public participation process, which included public meetings. Through this process, the public conveyed its desire for the waterfront area and, in particular, the walkways, to be as open as possible to allow pedestrians to stroll along the waterfront as well as observe the bay and beach activities. Santa Cruz incorporated the public's suggestions and desires into the Plans. *See id.*

In approximately the summer of 1992, non-profit groups, including Eco Watch, began distributing their message-bearing wares in exchange for donations. While the majority of groups distributed message-bearing T-shirts in exchange for donations, other groups distributed various items such as jewelry and food as well as engaged in activities such as face painting and hair styling in exchange for donations.

The groups generally distributed and displayed their wares through the use of portable tables, which often interfered with pedestrian traffic and added to the congestion on the walkways. As Lieutenant Joseph Haebe of the Santa Cruz Police Department testified, the walkways are almost impassable during good weather days during the tourist season, even without the presence of the portable tables. In addition, because these groups usually operate only when the weather is favorable during the tourist season, they are operating when congestion is at its highest and when the walkways can least accommodate the added burden. Moreover, the individual with overall responsibility for the waterfront as Director of Parks and Recreation, James Lang, stated that a major concern of Santa Cruz is pedestrian overuse of the walkways, especially during special events weekends. Lang testified that the walkways are inadequate to accommodate pedestrian demands during such weekends.

According to Santa Cruz, the sidewalk vending detracted from the aesthetics of the waterfront area. Furthermore, the portable tables that the groups set up, which were usually placed against the walkway railings, prevented individuals from strolling along the railings or leaning on them to view the bay and beach activity. *See, e.g.,* Santa Cruz Exh. "7" and "11" (photographs). Hall stated that the portable tables were inconsistent with the goals of the Plans because they prevented individuals from fully enjoying an open and accessible waterfront.

In addition to the problems of congestion and aesthetics, the groups' sidewalk activity also adversely affected the local merchant economy, which depends on tourists for 90% of its business. As noted, the non-profit groups are not subject to taxes or regulation and are thus able to distribute their wares for significantly less than local merchants could sell them. Additionally, because the sidewalk vendors are able to operate on the most lucrative days—*i.e.,* favorable weather days during the tourist season—whereas the local merchants must pay to maintain their operations all year long, the sidewalk vendors are afforded another competitive advantage. Kathryn Miller, a local merchant and owner of several tourist retail businesses, testified that non-profit groups such as Eco Watch were able to distribute nearly identical T-shirts to the ones she sold in her shops for approximately $12 less than she could sell them. Kathryn Miller also testified about

the negative economic impact the sidewalk vendors had on her shops, establishing that she suffered a significant loss of business as a result of the sidewalk vendors distributing their T-shirts. Marshall Miller, another local merchant and owner of tourist retail shops and past president of the Beach Area Business Association, testified that the issue of sidewalk vendors was a continuous agenda topic with the association because of the negative economic impact caused by the vendors. Marshall Miller further testified that his association repeatedly contacted city officials in various departments as well as officials at the state level to inquire what could be done to address the situation with the vendors. Miller also testified about the negative economic impact the vendors had on his businesses specifically, not only from T-shirt sale but also from the sale of jewelry and various other message-bearing merchandise.

In May 1996, the city council adopted the Santa Cruz ordinance to address its concerns and problems with the non-profit groups. *See* Santa Cruz Exh. "1." Like Monterey's decision to rescind its free-speech area, Santa Cruz adopted its ordinance in reliance upon the Ninth Circuit's decision in *One World,* 76 F.3d 1009. The ordinance prohibits all sidewalk sales along the Santa Cruz waterfront, an area of Santa Cruz comprising 59.11 acres of Santa Cruz' 7067 acres, or approximately .08% of the city's total area. *See* Santa Cruz Exh. "1." Unlike the Monterey ordinance, the Santa Cruz ordinance restricts sales only along the waterfront. Specifically, the Santa Cruz ordinance provides:

> It shall be unlawful for any person or organization to display, sell, offer for sale, rent, offer for rent, or offer in exchange for a donation, goods, wares, merchandise, foodstuffs, refreshments, or other kinds of property or service in the following areas: [3]
>> (a) On West Cliff Drive between Columbia Street and Beach Street;
>> (b) On Beach Street between West Cliff Drive and Third Street;
>> (c) On the vehicle and pedestrian thoroughfares of the Santa Cruz Municipal Wharf or on the Municipal Wharf's South End, Commons, and Agora;
>> (d) On the Beach Street Promenade Deck.

*Id.*

As Lieutenant Haebe testified, Santa Cruz actively enforces its ordinance, although it has not been enforced against Eco Watch. According to Robert Jacobson, a representative of Eco Watch, Eco Watch has refrained from disseminating T-shirts in exchange for donations since the enactment of the Santa Cruz ordinance.

### DISCUSSION

#### I

Plaintiffs commenced this action for declaratory and injunctive relief pursuant to 42 U.S.C. § 1983, 28 U.S.C. §§ 2201–02, and the Liberty of Speech Clause of the California Constitution. The court maintains jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3) and principles of pendent jurisdiction. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b).

#### II

▬ Plaintiffs assert both an as-applied challenge and an overbreadth facial challenge. An as-applied challenge to an ordinance asserts that the ordinance is unconstitutional as applied to a particular plaintiff's speech activity, even though the ordinance may be valid as applied to other parties. *See Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 796, 104 S.Ct. 2118, 2124, 80 L.Ed.2d 772 (1984). Such a challenge does not implicate the enforcement of the ordinance as against third parties, but rather asserts that the application of the ordinance is discriminatorily enforced against a particular plaintiff amounting to "viewpoint discrimination in violation of the First Amendment." *Foti v. City of Menlo Park,* 146 F.3d 629, 635 (9th Cir.1998). A determination that an ordinance's application is unconstitutional as applied to a particular plaintiff does not necessarily render the ordinance

---

3. The boundaries described in the ordinance delineate the waterfront area in Santa Cruz.

invalid, it only invalidates the particular application of the ordinance. *See, e.g., id.*

Alternatively, a facial challenge to an ordinance on grounds that the ordinance is overbroad asserts that the ordinance is so broad that it may inhibit the constitutionally protected speech of third parties, even if a particular plaintiff's speech is permissibly prohibited. *See Vincent,* 466 U.S. at 797, 104 S.Ct. at 2124. Unlike an as-applied challenge, a determination that an ordinance is unconstitutional as facially overbroad renders the entire ordinance invalid, rather than a particular application of the ordinance. *See Foti,* 146 F.3d at 635.

### III

Monterey contends that GVS cannot maintain either its as-applied challenge or its facial challenge because GVS lacks standing. Specifically, Monterey points out it has never enforced nor threatened to enforce its ordinance against GVS and that this lack of enforcement is fatal to GVS's as-applied challenge. With respect to GVS's facial challenge, Monterey contends that GVS lacks standing because it has failed to show either that the Monterey ordinance inhibited GVS's decision to discontinue its activities or that GVS is refraining from engaging in its activities because of the ordinance.

Santa Cruz asserts that Eco Watch lacks standing with respect to its as-applied challenge. Santa Cruz points out that its ordinance has never been enforced, or applied in any other manner, against Eco Watch. Santa Cruz does, however, concede that Eco Watch has standing to mount a facial challenge to its ordinance.[4]

Article III of the Constitution limits the exercise of federal judicial power to actual cases and controversies. *E.g., Flast v. Cohen,* 392 U.S. 83, 94–101, 88 S.Ct. 1942, 1949–53, 20 L.Ed.2d 947 (1968). A plaintiff may satisfy the "case" or "controversy" requirement by showing that he has suffered an actual or threatened injury as a result of the defendant's conduct and that the injury will be redressed by the relief sought. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). A plaintiff who fails to meet the requirements of Article III lacks standing to maintain his action. *See Secretary of State of Maryland v. Munson,* 467 U.S. 947, 955, 104 S.Ct. 2839, 2846, 81 L.Ed.2d 786 (1984).

In addition to the "limitations on standing imposed by Article III's case-or-controversy requirement, there exist prudential considerations that limit the challenges courts are willing to hear." *Munson,* 467 U.S. at 955, 104 S.Ct. at 2846. As a general matter, the plaintiff is permitted to assert only his own legal rights and interests and cannot maintain a claim for relief based upon the legal rights or interests of third parties. *See Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). However, these additional prudential limitations are lessened where First Amendment speech rights are implicated. *See Munson,* 467 U.S. at 955, 104 S.Ct. at 2846–47. Thus, even where a plaintiff may lack standing to assert an as-applied challenge to an ordinance—because the ordinance has not been applied to a particular plaintiff—he may nonetheless assert his facial challenge to the ordinance under the relaxed prudential standards for First Amendment challenges involving protected speech. *See Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973). A plaintiff is therefore "permitted to challenge a statute not because [his] own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Id.; see also Vincent,* 466 U.S. at 796–99, 104 S.Ct. at 2124–25 (while a plaintiff who does not have standing to challenge an ordinance as applied to him normally does not have standing to assert a facial challenge to the same ordinance, an exception exists where the plaintiff

---

4. Even though Santa Cruz concedes that Eco Watch has standing to challenge the ordinance, the court must independently satisfy itself that plaintiffs have standing to maintain this action. *E.g., Doremus v. Board of Education,* 342 U.S. 429, 434, 72 S.Ct. 394, 397, 96 L.Ed. 475 (1952).

challenges the ordinance under the First Amendment overbreadth doctrine). As the Court in *Munson* explained, "when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged." *Munson,* 467 U.S. at 956, 104 S.Ct. at 2847; *see also Perry v. Los Angeles Police Dept.,* 121 F.3d 1365, 1368 (9th Cir.1997) (plaintiffs are allowed to facially challenge a statute on overbreadth grounds, rather than as applied to them, because of the concern that protected speech or associative activities may be inhibited by the overly broad reach of the statute).

■ In the present case, it is clear that plaintiffs have standing to challenge the Monterey and Santa Cruz ordinances as facially invalid on overbreadth grounds. GVS demonstrated that it conducted its activities of distributing T-shirts in Monterey prior to Monterey rescinding its free-speech area. Moreover, GVS showed that it is refraining from distributing its T-shirts because of the ordinance and that it has concrete plans to recommence its activities if the ordinance is found constitutionally infirm. As noted, Richard Hebner testified that GVS selected him to oversee GVS' Monterey operations and that GVS will commence its activities immediately in the event the Monterey ordinance is found invalid. *See NAACP v. City of Richmond,* 743 F.2d 1346, 1351 (9th Cir. 1984) (where a plaintiff argues that his constitutional right to free speech is chilled, plaintiff is required to show that he is seriously interested in engaging in the prohibited speech or conduct). Moreover, Monterey

has presented no evidence that its ordinance is moribund; and there exists every indication that Monterey intends to enforce its ordinance, now that the free-speech area no longer exists. *See id.* Accordingly, plaintiff GVS has standing to assert its overbreadth facial challenge to the Monterey ordinance.[5] *See CR of Rialto, Inc. v. City of Rialto,* 975 F.Supp. 1254, 1259–60 (C.D.Cal.1997) (court held plaintiff had standing to facially challenge ordinance based upon assertion that plaintiff was being chilled as to its First Amendment rights, notwithstanding plaintiff lacked standing to challenge ordinance as applied to it).

■ Eco Watch likewise demonstrated that it distributed T-shirts for donations prior to Santa Cruz enacting its ordinance and discontinued its activities as a result of the Santa Cruz ordinance. In addition, as Robert Jacobson testified, Eco Watch wishes to continue distributing its T-shirts and has plans to recommence its activities if the ordinance is found unconstitutional. Moreover, while the Santa Cruz ordinance has not been enforced against Eco Watch, Santa Cruz has been consistently enforcing the ordinance against others and, as Lieutenant Haebe testified, has plans to continue to do so unless its ordinance is found unconstitutional. Thus, the court concludes that Eco Watch has standing to assert its overbreadth facial challenge to the Santa Cruz ordinance.[6]

**IV**

■ Turning to the merits of this action, it is settled that the sale of message bearing T-shirts, such as the ones here, is

---

5. The court declines to find that GVS's facial challenge is not ripe for review, as urged by Monterey.

6. As counsel for Santa Cruz pointed out in argument to the court, a significant question exists as to Eco Watch's ability to maintain its as-applied challenge to the Santa Cruz Ordinance. Even assuming Eco Watch can clear the as-applied standing hurdle with an allegation that Santa Cruz threatened enforcement of its ordinance against Eco Watch, Eco Watch has failed to offer any evidence that the Santa Cruz Ordinance is unconstitutional in the manner in which it was applied to Eco Watch's particular speech activi-

ty, a necessary element of an as-applied challenge. *See Vincent,* 466 U.S. at 803, 104 S.Ct. at 2127; *Foti,* 146 F.3d 629 at 635. Moreover, because, as discussed *infra,* the court finds that the Santa Cruz ordinance is content neutral, it would apply the well-established time, place, and manner standard to both challenges. *See, e.g., One World,* 76 F.3d at 1012 (applying time, place, and manner standard to an as-applied challenge of a content neutral ordinance); *Foti,* 146 F.3d at 636–40 (applying time, place, and manner standard to a facial challenge of a content neutral ordinance). In other words, the court's conclusions with respect to each of these elements applies equally to Eco Watch's challenges, whether facial or as-applied.

**1044**

protected speech under the First Amendment. *See Gaudiya Vaishnava Soc'y v. City and County of San Francisco,* 952 F.2d 1059, 1064 (9th Cir.1990); *One World,* 76 F.3d at 1012. In determining whether an ordinance that regulates or restricts protected speech or conduct is valid, courts employ the standard governing time, place, and manner restrictions.[7] *See, e.g., Foti,* 146 F.3d 629, 638–41, 1998 WL 211733 at *5–9. Such restrictions are valid if they are content-neutral, are narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels of communication.[8] *See Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989).

### A

Whether a speech restriction is content-neutral is determined by whether it is "justified without reference to the content of the regulated speech." *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984). An ordinance that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages and no effect on others. *One World,* 76 F.3d at 1012. The test is whether the government has adopted the speech restriction "because of disagreement with the message it conveys." *Ward,* 491 U.S. at 791, 109 S.Ct. at 2754.

In *One World,* the Court found that legitimate governmental interests such as maintaining the aesthetic attractiveness of the city, promoting public safety, the orderly movement of pedestrians, and protecting the local merchant economy did not concern the content of speech. 76 F.3d at 1012. This finding, coupled with no evidence that the ordinance in question was designed to suppress certain ideas that the government found distasteful, led the court to the conclusion that the ordinance was applied without regard to content, and thus, was content-neutral.[9] *Id.* In reaching its conclusion, the court found it significant that the ordinance imposes a flat ban on the prohibited activity, which is enforced without regard to the content of the speech. *See id.*

Turning to the instant case, the court finds that the Monterey ordinance serves purposes unrelated to the content of expression and imposes a flat ban on the prohibited activity. The ordinance restricts commercial activity on public property and does not expressly prohibit expressive conduct. Though the court acknowledges that the ordinance has an incidental effect on

---

7. As a preliminary matter, the court notes that plaintiffs allege that the ordinances violate both the Liberty of Speech Clause of the California Constitution and the First Amendment to the United States Constitution. Where state provisions offer more expansive protection than the federal constitution, the court must address the state constitutional claims in order to avoid unnecessary consideration of the federal constitutional claims. *See Carpenter v. City and County of San Francisco,* 93 F.3d 627, 629 (9th Cir.1996) (looking to California Constitution rather than federal Constitution to resolve issue concerning free exercise of religion), *cert. denied,* — U.S. —, 117 S.Ct. 1250, 137 L.Ed.2d 331 (1997).

As a general matter, "the liberty of speech clause in the California Constitution is more protective of speech than its federal counterpart." *Griset v. Fair Political Practices Comm'n,* 8 Cal.4th 851, 35 Cal.Rptr.2d 659, 884 P.2d 116 (Cal.Sup.Ct.1994); *see Wilson v. Superior Court,* 13 Cal.3d 652, 658, 119 Cal.Rptr. 468, 532 P.2d 116 (Cal.Sup.Ct.1975) (state free speech guarantee is "more definitive and inclusive than the First Amendment."). However, "[a]lthough California applies broader protection of speech in

certain respects, it appears that California assesses the validity of time, place and manner restrictions under the familiar federal constitutional standards." *Los Angeles Alliance for Survival v. City of Los Angeles,* 987 F.Supp. 819, 829 (C.D.Cal.1997) (citing *Savage v. Trammell Crow Co., Inc.,* 223 Cal.App.3d 1562, 1572, 273 Cal. Rptr. 302 (1990)). Thus, the court will analyze plaintiffs' claims under the California Constitution in conjunction with its analysis of plaintiffs' claim under the First Amendment's time, place, and manner standards.

8. In employing the standard governing time, place, and manner restrictions, the court declines plaintiffs' request to apply a strict scrutiny analysis to the ordinances.

9. The court in *One World* also found that the ordinance had not been applied to plaintiffs because of the views they expressed, inasmuch as *One World* involved an as-applied challenge to the ordinance. *See One World,* 76 F.3d at 1012. In this case, there is likewise no evidence that enforcement of either ordinance was threatened against a particular plaintiff because of its views.

those wishing to convey their message through the sale of message-bearing merchandise, this effect does not render the ordinance invalid. *See One World,* 76 F.3d at 1012. The court also finds that there is a complete lack of evidence that the free-speech area was rescinded "because of disagreement with the messages conveyed" by any particular group. *See Ward,* 491 U.S. at 791, 109 S.Ct. at 2753. Thus, the court finds that the Monterey ordinance in question is content-neutral.

The court also finds that the Santa Cruz ordinance is content-neutral and imposes a flat ban. Similar to the Monterey ordinance, it only restricts commercial activity and in no way expressly prohibits expressive conduct. Likewise, there is no evidence to suggest that the ordinance was adopted because of disagreement with the messages conveyed by a particular group. Thus, the court finds that the Santa Cruz ordinance is content-neutral.

**B**

The restriction of First Amendment rights must also serve a significant governmental interest to be valid. As indicated, it is well settled that interests such as maintaining aesthetic attractiveness, promoting public safety, orderly movement of pedestrians, and protecting the local merchant economy are all significant governmental interests. *See One World,* 76 F.3d at 1012.

 In addition to the requirement that the ordinance serve significant governmental interests, the regulation of speech must be narrowly tailored to serve these interests. *See Ward,* 491 U.S. at 799, 109 S.Ct. at 2758. A regulation is narrowly tailored to serve significant governmental interests if the interests "would be achieved less effectively absent the regulation." *Id.* The ordinance, however, does not need to be the least restrictive alternative available. *See One World,* 76 F.3d at 1013. As long as the regulation is not substantially broader than

necessary to achieve the government's interest, the regulation will not be rendered invalid on the basis that the government's interests could have been adequately served by a less restrictive alternative. *See Ward,* 491 U.S. at 800, 109 S.Ct. at 2758.

 Monterey established at trial that it has a substantial interest in facilitating the safe and orderly movement of pedestrians, maintaining its aesthetic and historic significance, and protecting the local merchant economy as well as the economic viability of the city. Monterey also established that it has a substantial interest in maintaining and preserving its public areas in order to retain its status as a premiere tourist attraction. It is plain that the interests advanced by Monterey are served by the ordinance. For instance, the Monterey ordinance will facilitate the safe and orderly movement of pedestrians because it ensures that the walkways will remain free from the clutter of portable tables and pedestrians associated with sidewalk vending. As the court observed firsthand, this is not only true in the downtown area—where the narrow sidewalks create safety issues—but it is also true in the highly congested area near the wharf and the Recreation Trail. The Monterey ordinance will also ensure that the city remains aesthetically pleasant and that the viewing easement of the waterfront remains clear because it restricts commercial activity and its associative visual clutter on the wharf and public areas. Lastly, the ordinance protects the local merchants from unfair competition. The local merchants provide Monterey with a prosperous and stable local merchant economy that helps provide Monterey with a necessary tax base. These merchants, who pay taxes to the city and are subject to the city's regulations, cannot compete with transient sidewalk vendors who pay no rent, no taxes, and are not otherwise subject to regulation. Thus, the Monterey ordinance clearly furthers its legitimate interests.[10]

---

10. Plaintiffs argue that the interests advanced by Monterey are fallacious because when Monterey initially set up its free-speech area it indicated that the area would not be a visual nuisance nor would it unsafely impede pedestrian traffic flow.

*See* Pl.Exh. "K" (February, 1995 letter from Monterey city attorney to plaintiffs' attorney). The court finds plaintiffs' argument unpersuasive. While the letter clearly sets forth Monterey's opinion that the area will not contribute to

During trial, plaintiffs proffered evidence that the activities conducted by specific nonprofit groups did not interfere with pedestrian traffic flow, detract from Monterey's aesthetics, or unfairly compete with local merchants in an attempt either to belie Monterey's proffered governmental interests or to demonstrate such groups activities did not contribute to the concerns targeted by the Monterey ordinance. In either case, plaintiffs' efforts fail. First, courts must give deference to "legislative" facts and refrain from intruding upon the accumulated common sense judgment of local lawmakers. *E.g., Dunagin v. City of Oxford,* 718 F.2d 738 (5th Cir.1983); *see also Turner Broadcasting System, Inc. v. Federal Communications Comm'n,* 512 U.S. 622, 666, 114 S.Ct. 2445, 2470–71, 129 L.Ed.2d 497 (1994); *Railway Express Agency, Inc. v. New York,* 336 U.S. 106, 109, 69 S.Ct. 463, 465, 93 L.Ed. 533 (1949) (court would be "trespassing on one of the most intensely local and specialized of all municipal problems" if it were to find that a regulation banning the operation of advertising vehicles had no relation to safety or traffic problems in New York City). Thus, the court will defer to the judgment of Monterey's officials because it finds that the ordinance is content-neutral, furthers legitimate governmental interests, and because nothing has been advanced that demonstrates that the officials' findings are suspect or false. *See Railway Express Agency,* 336 U.S. at 109, 69 S.Ct. at 465. Second, plaintiffs' efforts fail because the validity of a regulation does not depend upon whether the regulation "furthers the government's interests in an individual case," but rather, the "validity of the regulation depends on the relation it bears to the overall problem the government seeks to correct." *See, e.g., Ward,* 491 U.S. at 801, 109 S.Ct. at 2759. Thus, it "is beside the point" whether specific groups may or may not have obstructed pedestrian traffic flows, contributed to visual blight, or unfairly competed with local merchants as long as the

Monterey ordinance validly addressed the overall problem it was experiencing with sidewalk vendors. *See id.*

In furthering its substantial interests, the Monterey ordinance is narrowly tailored and is not substantially broader than necessary. The legitimate interests that Monterey is advancing by the ordinance could not be achieved more effectively, if at all, absent the ordinance. Without the Monterey ordinance, the sidewalk vendors add significantly to the congestion in the city and detract from the sales of the local merchant economy. Additionally, the visual blight and clutter from such transient vendors severely undermine Monterey's considerable efforts to provide a pleasant strolling and walking area near the water and around the historic sights of the city. Because the Monterey ordinance addresses these concerns without significantly restricting a quantity of speech, the court finds the ordinance is narrowly tailored. *See One World,* 76 F.3d at 1013–14.

Santa Cruz likewise has proffered evidence that the existence of its ordinance facilitates the orderly movement of pedestrians on its crowded sidewalks, maintains the aesthetics of the waterfront area so that it may retain the area's viability as a tourist attraction, and protects its local merchants from what it considers to be unfair competition from sidewalk vendors. The ordinance is completely consistent with the goals advanced by the city's redevelopment Plans. For example, the Santa Cruz ordinance restricts the sale of merchandise along its heavily traveled walkways along the waterfront, where the city experiences its greatest congestion. The ordinance permits the city to maintain the orderly flow of those using the walkways and prevents the congestion associated with merchandise transactions along such walkways. The ordinance also ensures that Santa Cruz remains visually pleasant and free of clutter, as well as protecting the local merchant economy, which is vital to Santa Cruz' tax base.

---

visual clutter nor impede pedestrian traffic, the letter must be viewed in its proper context and in relation to the timing of the events in issue. The letter was written before the free-speech area was set up and indicated that Monterey was of the opinion that the area it selected would not detract from its visual surroundings nor impede

pedestrian traffic. If, as the court finds, Monterey later concluded that allowing groups to distribute its T-shirts in the area did contribute to visual clutter and did impede pedestrian traffic than the interests advanced are no less legitimate at that point than if Monterey had not issued its February 1995 letter.

The court finds that such interests are clearly significant to Santa Cruz.

During trial, Eco Watch, as in the case against Monterey, expended considerable effort attempting to prove it did not interfere with pedestrian traffic flow, detract from Santa Cruz' aesthetics, or unfairly compete with local merchants in an attempt either to belie Santa Cruz' proffered governmental interests or to demonstrate that Santa Cruz need not be concerned with Eco Watch because its activities do not contribute to the problems along the waterfront. As previously discussed, Eco Watch's arguments here are also without merit. As noted, courts must give deference to "legislative" facts and refrain from second guessing the wisdom of local lawmakers, *see Turner Broadcasting,* 512 U.S. at 666, 114 S .Ct. at 2470–71, and the validity of a regulation does not depend upon whether the regulation furthers the government's interests in a particular case, but rather, depends on the relation the regulation bears to the overall problem the government seeks to rectify. *See, e.g., Ward,* 491 U.S. at 801, 109 S.Ct. at 2759.

The court also finds that the Santa Cruz ordinance is narrowly tailored to advance these significant interests and that the ordinance is not substantially broader than necessary. Without the ordinance, Santa Cruz would satisfy its interests less effectively, assuming it could satisfy its interests at all by a less restrictive alternative. For instance, without the Santa Cruz ordinance, the congestion along the waterfront area is heavier preventing open access to the bay and local merchants would continue to be subjected to unfair competition. In addition, absent the ordinance, the Plans' goals of maintaining a pleasant and uncluttered appearance would be undermined. The Santa Cruz ordinance is thus narrowly tailored because it addresses these legitimate interests and does not restrict a significant quantity of speech. As noted, the ordinance only restricts the activity along the waterfront area, where Santa Cruz' concerns are most significant, and not throughout the entire city. Accordingly, the court finds that the ordinance is narrowly tailored to satisfy its interests. *See One World,* 76 F.3d at 1013–14.

## C

■ Finally, a court must find that there exists ample alternative channels of communication to uphold the regulation of protected speech. *See ACORN v. City of Phoenix,* 798 F.2d 1260, 1271 (9th Cir.1986). As long as the ordinance leaves open alternative avenues for a party to convey its message or messages, a regulation will not be deemed unconstitutional on this ground. *See One World,* 76 F.3d at 1014.

■ The court finds that the Monterey ordinance leaves open ample alternative channels of communication. The Monterey ordinance only prohibits conducting or transacting commercial business on public property. It does not prohibit the disseminating of literature, leafleting, engaging the public in conversation or other forms of oratory, or any combination thereof. It also does not prevent a party from handing out T-shirts with its intended message for free or prevent someone from wearing a message bearing T-shirt and thus act as a human billboard. Significantly, the Monterey ordinance does not even prohibit the solicitation of donations that does not entail the exchange of merchandise. Furthermore, a party who wishes to engage in First Amendment activity by conveying its message through distributing a message-bearing T-shirt in exchange for a donation may do so from a fixed retail outlet. Moreover, the Monterey ordinance does not prevent GVS, or any other party, from reaching its intended audience—it merely restricts one means of disseminating its message to its intended audience. *Cf. Bay Area Peace Navy v. United States,* 914 F.2d 1224, 1229–30 (9th Cir.1990); *see One World,* 76 F.3d at 1014–15 (rejecting plaintiffs' reliance on *Bay Area Peace Navy,* the court stated the ordinance does not prevent plaintiffs from reaching their intended audience inasmuch as plaintiffs "have a number of alternative means of disseminating their message"). Thus, the court finds that the Monterey ordinance clearly provides parties with ample alternative channels of communication. *See One World* 76 F.3d at 1013 ("The ordinance forecloses one narrow form of expression— sidewalk sales of message-bearing merchan-

dise—and leaves the plaintiffs free to disseminate and seek financial support for their views through myriad and diverse alternative channels, such as handing out literature, proselytizing or soliciting donations." (citations and quotations omitted)).

The court also finds that the Santa Cruz ordinance leaves open ample alternative channels of communication. The Santa Cruz ordinance only prohibits the sale and display of merchandise, whether or not the merchandise is expressive. Like the Monterey ordinance, it does not prohibit the disseminating of literature, leafleting, engaging the public in conversation or other forms of oratory, or any combination thereof. Nor does the ordinance prevent a party from distributing T-shirts with its intended message for free or prevent someone from wearing a message-bearing T-shirt. The Santa Cruz ordinance also does not prohibit the solicitation of donations that does not entail the exchange of merchandise. As the case with Monterey, a party who wishes to engage in First Amendment activity by conveying its message through distributing T-shirts may do so from a fixed retail outlet. There is nothing contained in the Santa Cruz ordinance that prevents Eco Watch or any other party from reaching its intended audience. Furthermore, unlike in Monterey, Eco Watch may sell or distribute its T-shirts anywhere else in Santa Cruz, including the downtown area. Thus, the court finds that the Santa Cruz ordinance clearly provides parties with ample alternative channels of communication. *See One World* 76 F.3d at 1013.

## CONCLUSION

For the foregoing reasons, the court concludes that the Monterey ordinance and the Santa Cruz ordinance are not unconstitutional restrictions on plaintiffs' protected conduct.[11] Accordingly, plaintiffs' request for injunctive and declaratory relief is denied and the complaint is dismissed.

IT IS SO ORDERED.

---

11. Accordingly, because the court concludes that Eco Watch's facial challenge to the Santa Cruz ordinance fails, its as-applied challenge, assuming it is viable, also must fail.